THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

_____

GRACIELA RODGRIGUEZ,       )
CHARLES STEVENS,          )
KHALID SALAHUDDIN, and   )
NATHAN ALEXANDER,       )
on behalf of themselves and others similarly )
situated,                   )
                      )

     Plaintiffs,          )     CIVIL ACTION NO.
                      )

     v.                )     <u>5:18-cv-1265</u>
                      )

STEVEN MACH, in his official capacity as )
Chairman of the Texas Department of Public )     <u>JURY DEMANDED</u>
Safety Commission;           )
STEVEN McCRAW, in his official capacity as )
Director of the Texas Department of Public )
Safety;               )
SKYLOR HEARN, in his official capacity as )
Deputy Director of Administration and Services )
of the Texas Department of Public Safety; )
AMANDA ARRIAGA, in her official capacity )
as Division Director of the Driver License )
Division of the Texas Department of Public )
Safety, and            )
GREG ABBOTT, in his official capacity as )
Governor of Texas,       )
                      )
     Defendants.        )
_____)

# CLASS ACTION COMPLAINT

## Introduction

1.    This case is about the Texas Department of Public Safety operating a wealth-based driver's license suspension scheme that traps the state's most vulnerable people in a cycle of debt and hardship.  As a source of revenue, Texas targets individuals with certain traffic infractions through the "Driver Responsibility Program," which imposes hundreds or thousands

1

of dollars in "surcharges" each year for a period of three years following a single offense. Failure to pay these additional and punitive surcharges results in an automatic license suspension, even if the individual cannot afford to pay.  In Texas, a driver's license is indispensable to mobility and economic stability, and an individual's ability to drive is their lifeline to finding and maintaining employment, taking children to school, making doctor's appointments, attending addiction treatment, and carrying out necessary daily activities. Defendants take advantage of the indispensable nature of a driver's licenses by using it as a coercive tool to generate revenue, creating insurmountable hurdles for the state's poorest people through a complex and debilitating license suspension scheme.

2.     Under the Driver Responsibility Program ("DRP"), Defendants automatically impose surcharge fees in *addition to* — not in lieu of — any punishment and fines already imposed for an individual's underlying traffic offense.  Individuals are therefore responsible for their original fines, license reinstatement fees, and any related costs before they must try to pay off hundreds or thousands of dollars in surcharges to keep their licenses.  Those who cannot afford their surcharges will have their licenses suspended indefinitely until they can resolve their surcharge debts.

3.     Many Texans never receive any notice whatsoever about the surcharge program itself or the fees they owe.  For those who do, the notice sent by Defendants offers only three options to avoid license suspension: pay the required three years of surcharge fees in advance; pay this year's full amount in advance; or pay the full amount in monthly installments at a non-adjustable rate predetermined by the state.

4.     Suspensions for nonpayment of surcharges under the DRP are automatic; Defendants conduct no inquiry into an individual's ability to pay or whether the nonpayment was

willful.  Defendants offer no meaningful or accessible opportunities for impoverished individuals to avoid suspension of their licenses simply because they cannot afford the punitive surcharges.

5.      Even though surcharges must be waived for impoverished individuals under Texas law, Defendants have created a convoluted and inaccessible system of surcharge waivers and reductions that undercuts the law and often ensures that lower-income individuals lose their driver's licenses.

6.      Defendants place the onus on indebted drivers to find substantive information about any alternatives other than payment in full under the DRP.  Defendants offer little to no information about waivers or reductions.  The notice they provide is opaque and inaccessible to many of the hundreds of thousands of drivers subject to the DRP, and the administrative process for obtaining any debt relief is nearly impossible to access without retention of counsel.  While a lack of procedural protections and access to alternatives may not pose a problem for individuals who can immediately pay their surcharges, it is devastating for the many who cannot.

7.      As of January 2018, over 1.4 *million* Texans have suspended licenses for failure to pay DRP surcharges.  Unfortunately, this is an unsurprising figure in a state where 15.6% of the population — over 4.4 million people — live below the federal poverty line and 14.3% of households are food insecure.  The pervasive poverty among Texans is compounded by the DRP, which levies huge additional fines for traffic offenses that are disproportionately experienced by poorer individuals, such as driving without insurance.  When it comes to the choice between making ends meet and paying surcharges, the DRP inevitably means the loss of a driver's license for impoverished Texans.

8.      In addition to surcharges, the DRP includes additional administrative fees, reinstatement fees, license issuance fees, and payment plan fees.  Such a debilitating scheme

creates a cycle of inescapable poverty and hardship for lower-income Texans with no conceivable benefit to society.  Indeed, Texas lawmakers have noted that the extreme economic hardship caused by license suspensions under the DRP is "creating a permanent underclass" in Texas.[1]

9.     Because many individuals never receive notice that their licenses are suspended under the DRP, indebted individuals can easily (and unknowingly) accrue criminal charges for Driving While License Invalid (DWLI).  Impoverished individuals struggling to pay off a suspended license can also accrue DWLI charges if they drive during an emergency or while carrying out necessary daily activities for their family or their health. A DWLI infraction is eligible for additional DRP surcharges in and of itself, subjecting lower-income individuals to multiple, years-long DRP surcharge "accounts" that they cannot afford to settle.  This cycle of crushing debt forces impoverished individuals into continued contact with the criminal system for innocuous offenses, and often forces them to live with indefinitely suspended licenses.

10.     Although Texas' debilitating license suspension scheme is designed to coerce payment of surcharges, for those *unable* to pay, Texas's system will never accomplish that goal: no incentive or punishment will increase the likelihood of a person paying a debt if she simply does not have the money.

11.     Indefinite license suspension for individuals unable to pay surcharges is irrational, counterproductive, and discriminatory.  Depriving impoverished persons of the vital ability to drive because they are unable to pay debt violates the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clauses of the Fifth and Fourteenth Amendments, and

---

[1] Jamie Lovegrove, "Lawmakers Compare Unpopular Driver Surcharge Program to Debtors' Prison," The Texas Tribune (Jan. 27, 2016), https://www.texastribune.org/2016/01/27/state-senators-criticize-driver-responsibility-pro/ (quoting Sen. Don Huffines (R-Dallas)).

longstanding Supreme Court precedent forbidding punitive sanctions against individuals solely due to their inability to pay.

12.     By and through their attorneys, on behalf of themselves and others similarly situated, Plaintiffs seek declaratory and injunctive relief against Defendants in their official capacities to end this unconstitutional license suspension scheme.

## Nature of the Action

13.     Under the DRP surcharge program, any driver convicted of certain enumerated offenses — which carry their own court-imposed costs, fines, and penalties — will automatically have an additional DRP surcharge imposed upon them every year for three years following that single underlying offense.  *See, e.g.*, Tex. Transp. Code Ann. §§ 708.103(a).

14.     Under the DRP, driving without a valid license results in a $100 surcharge per year for three years.  Tex. Transp. Code Ann. § 708.104.  Driving without proof of insurance results in a $250 surcharge per year for three years.  Tex. Transp. Code Ann. §§ 708.103; 602.191.  Driving with a suspended vehicle registration results in a $250 surcharge per year for three years.  Tex. Transp. Code Ann. §§ 708.103; 601.371.  Driving with any measureable amount of alcohol in one's system results in a surcharge between $1,000 or $2,000 per year for three years. *See* Tex. Transp. Code Ann. § 708.102.

15.     Before DRP surcharges are imposed, driving without a valid license is already a Class C misdemeanor and can carry a penalty up to $500.  Tex. Transp. Code Ann. § 521.457(e); Tex. Penal Code § 12.23.  Driving without insurance already carries a penalty of a fine between $175 and $300 for a first offense, and a fine between $350 and $1,000 for a second offense.  Tex. Transp. Code Ann. §§ 601.191(b)-(c).  Driving with a suspended vehicle registration already results in a fine between $100 and $500 and confinement in jail for up to six months.  Tex.

Transp. Code Ann. § 601.371.   Driving while intoxicated already carries a penalty of confinement in jail for up to 180 days (with a minimum of three days) and a fine up to $2,000 for a first offense.  Tex. Penal Code §§ 49.04; 12.22.

16.     Under the DRP, Defendants also conduct an annual tally of the "moving violation" points accumulated by a driver over the preceding three years and impose a surcharge fee on any person with more than six points on their license.  *See* Tex. Transp. Code § 708.054. Points accumulate easily — minor offenses such as coasting, disregarding a green turn arrow, failure to signal a turn, passing on the right, failure to dim headlights, following too closely, driving below the minimum speed, or an "improper turn" can each result in a two-point penalty against a driver.  *See* Tex. Transp. Code § 708.052(b)(1); Tex. Admin. Code § 15.89.

17.     The DRP surcharge is $100 for the first six points and $25 for each additional point. *Id.*

18.     Texas law requires that the Department of Public Safety waive "all surcharges" for a person who is indigent.  Tex. Transp. Code § 708.158.

19.     The letters sent by Defendants to indebted drivers do not disclose this requirement.

20.     This statutory waiver provision is limited to individuals with income under 125% of the Federal Poverty Line.  *See id.*   For a single individual, this amounts to an income of only $15,175 per year.[2]

21.     Many individuals with meager income over 125% of the FPL have necessary costs of living that make it impossible to pay off hundreds or thousands of dollars in additional surcharge fees to avoid losing their driver's licenses.

---

[2] 2018 Federal poverty Guidelines, https://www.projusticemn.org/fedpovertyguidelines/

22.     The statute outlining surcharge waivers for impoverished people requires certain forms of documentation to establish poverty, which can be difficult to obtain for people who lack access to resources.   The onus is on the indebted individual to find out about these required documents and submit them to the court.   *See* Tex. Transp. Code  § 708.158(b); *see also* Ex. 1, Ginzel Decl., ¶ 10–11 ("If an applicant is unable to obtain a driver's license because of surcharges, they also likely lack the required identification to obtain a copy of their child's birth certificate to prove their dependence and waiver of said surcharges. It can be an endless loop of burdens and hurdles for which the only solution is legal representation. Many unrepresented individuals become so discouraged that they give up.").

23.     Beyond providing these particular required documents, there is no other procedure for an individual to establish that they are too poor to pay their surcharges.

24.     There is no statutory provision for individualized ability-to-pay assessments or hearings for those living under the Federal Poverty Line.

25.     There is no statutory provision for relief for individuals with income above 125% of the FPL.

26.     The DRP statutory scheme requires that the Department of Pubic Safety Defendants establish an "indigency program."  *See* Tex. Transp. Code § 708.157.  However, the statute outlines no requirements and gives no notice about what the program includes, how it operates, who is eligible, what relief is available to them, or how to obtain it.  *See id.*

27.     The law simply states "[t]he department by rule may establish a periodic amnesty program for holders of a driver's license on which a surcharge has been assessed for certain offenses, as determined by the department" and "[t]he department by rule shall establish an indigency program for holders of a driver's license on which a surcharge has been assessed for

certain offenses, as determined by the department."  *See, e.g.*, Tex. Transp. Code § 708.157(a)-(c).  The law does not facially define amnesty or indigency programs or provide information on how to apply for them.

28.     The Department of Public Safety must notify individuals of their surcharges by sending two letters.  Tex. Transp. Code Ann. § 708.151.  These letters must "specify the date by which the surcharge must be paid," the total amount of the surcharge, the amount of surcharge installment plan rates, and must "state the consequences of a failure to pay the surcharge."  *Id.*

29.     However, the Department is not required to provide any information about purported financial relief programs to individuals too poor to avoid their imminent license suspension, and it is not required to disclose its obligation to waive surcharges for any person who is impoverished under Texas law.  *See id.*; Tex. Transp. Code Ann. § 708.157; Tex. Transp. Code § 708.158(a).

30.     Defendants do not inform individuals of their obligation to waive surcharges for indigent individuals and do not provide adequate notice of relief options for impoverished drivers.

31.     Indeed, when Defendants send notice to debtors about the DRP, the sole reference to alternative options for impoverished drivers is difficult to find for most people; it is more than half way down the page, in the smallest print on the notice, and follows several all-capital, bolded threats of license suspension and demands for money with no indication that alternatives exist.  *See* Ex. 2.

32.     The one line regarding statutorily-available alternatives for people living in poverty simply reads: "Visit the website https://www.txsurchargeonline.com to make payments

using a credit card or electronic check (ACH). You may also use this website to apply for either the Indigency or Incentive surcharge balance reduction programs." *Id.*

33.     The letter does not define the terms "Indigency" or "Incentive" nor does it give any explanation of what the programs are.

34.     The language in this notice is without context, and difficult to understand for most individuals without prior knowledge of the programs.

35.     Even though the Department of Public Safety is required to waive all surcharges for individuals living in poverty, when Defendants send pre-deprivation notices, they provides no information about what the words "Indigency" and "Incentive" mean, what the programs are, what types of people are eligible, or how to apply. *See* Ex. 2, Surcharge Notice.

36.     This problem is compounded because there is also no specific information about how to obtain reductions or amnesty in Texas's codified law.  Instead, administration and enforcement of those programs is delegated to the Department of Public Safety.  Tex. Transp. Code § 708.157.

37.     This single line on Defendants' letters is insufficient to put individuals on notice that, if they believe they cannot afford to pay, there are waiver and reduction programs for which they are eligible and they should look to Texas statutory law for application requirements.

38.      For individuals above 125% of the Federal Poverty Line in need of a surcharge reduction, looking to Texas statutory law would be futile in any event — there is no information about relief for these individuals in the codified law, and the agency responsible for administration of the plan fails to provide notice of alternative options. *Id.*

39.     Even though there is insufficient notice of relief for individuals above 125% of the Federal Poverty Line, surcharge reductions are ostensibly available.  For individuals with

income between 125–300% of the Federal Poverty Line, the Defendants impose an automatic, one-size-fits-all 50% reduction in surcharge fees and require that the reduced surcharge be paid within six months without exception.

40.     Beyond the single obscure line in their suspension-threat letters, Defendants provide no pre-deprivation notice that this reduction exists and no information about who is eligible or how to apply.

41.     The 50% reduction does not include any individualized ability-to-pay inquiry and does not take into account an individual's employment status, health, housing situation, family size, expenses, court-ordered fines and fees, or other mitigating factors.

42.     Individuals who are lucky enough to find out about this reduction and how to apply for it are offered no meaningful process to seek a lower reduction or to be heard on their ability to pay 50% of their surcharges, which can still amount to hundreds or thousands of dollars.

43.     For many individuals struggling to support themselves and/or a family, Defendants' demand for surcharges at 50% of their original amount is still an insurmountable hurdle with devastating consequences for nonpayment.

44.     Despite the insufficient notice of waiver and reduction alternatives for impoverished individuals, the Department of Public Safety automatically suspends the driver's licenses of people who fail to pay the punitive surcharge fees associated with the DRP.  *See* Tex. Transp. Code Ann. §§ 706.002, 706.004, 708.152.

45.     The Department makes no inquiry into whether nonpayment was willful or the result of indigence before suspending a person's driver's license.

46.     An individual's license will remain suspended until they pay the full amount of their surcharges and "any related costs."  Tex. Transp. Code. Ann. § 708.152(b).

47.     Individuals who enter into installment payment plans might have their licenses tentatively reinstated — however, Defendants do not inform individuals of this factor when they are making installment payments.

48.     Defendants do not offer information to indebted individuals about how to get their license reinstated if they are making installment plan payments.

49.      If an individual misses a single payment, their license will be re-suspended.  Thus many poorer individuals continue to have their licenses suspended for years while struggling to pay off surcharges in relatively small increments.

50.     All the while, DRP surcharges accrue interest, making payment-in-full virtually impossible for impoverished individuals.

51.     Data from January 2018 show that over 1.4 million Texas drivers have suspended licenses for unpaid surcharges under the Driver Responsibility Program.   Ex. 3, Public Information Request Response Letter from DPS at ¶ 4 (Jan. 23, 2018).

52.     Hundreds of thousands of people in Texas currently have suspended licenses due to inability to pay mounting and state-ordered fines, fees and surcharges.

53.     Defendants violate Plaintiffs' procedural due process rights because the notice and opportunity given to indebted drivers who cannot pay their fees is opaque, devoid of substantive information that would reasonably lead an individual to access programs to avoid a suspension, and patently inadequate to meaningfully protect their property interest in their driver's licenses.

54.     Defendants violate Plaintiffs' procedural due process rights by failing to give notice of the information needed to conduct individualized financial inquiries for surcharge reductions, and failing to provide meaningful notice or opportunities for individuals who cannot access the required documents.

55.     Defendants violate Plaintiffs' procedural due process rights by failing to give any substantive information about the purported surcharge reduction program, which does not appear facially on the law, even though administration of that program is delegated to them exclusively and they have a legal obligation to waive all surcharges for impoverished individuals.

56.     Defendants violate Plaintiffs' equal protection rights because the state's suspension scheme discriminates on the basis of wealth status by suspending licenses for nonpayment, even where failure to pay is the result of poverty rather than willfulness.  This amounts to a penalty that has long been condemned by the Supreme Court: a penalty for being poor.

57.     Defendants violate Plaintiffs' equal protection rights because the state's suspension scheme discriminates on the basis of wealth status without any rational connection to a legitimate state interest.

58.     Defendants violate Plaintiffs' equal protection rights because they require that licenses remain suspended until DRP surcharges have been paid in full — meaning wealthy individuals can have their licenses reinstated immediately while poorer individuals who enter into payment plans may have their licenses suspended for months or years while they try to pay off the same surcharges under the same program.

59.     Defendants violate Plaintiffs' equal protection rights because they subject Plaintiffs to unduly harsh debt collection methods — namely, state-sanctioned license suspension — because their debts are to the government rather than a private creditor.

60.     Defendants violate Plaintiffs' substantive due process rights because Plaintiffs have a fundamental right to both interstate and intrastate travel, and without meaningful alternatives to driving, the lack of a valid license necessarily impedes those rights without being narrowly tailored to a government interest.

61.     Defendants violate Plaintiffs' right to fundamental fairness in government processes under the Equal Protection and Due Process Clauses because suspending licenses without consideration of an individual's willfulness in nonpayment is fundamentally unfair under the Fourteenth Amendment to the U.S. Constitution.

## Jurisdiction and Venue

62.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq.*, and the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

63.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

64.     Graciela Rodriguez is a 76-year-old resident of San Antonio, Texas, whose driver's license is suspended for unpaid DRP surcharges.

65.     Charles Stevens is a 40-year-old Navy veteran and resident of San Antonio, Texas, whose driver's license is suspended for unpaid DRP surcharges.

66.     Khalid Salahuddin is a 40-year-old disabled Navy veteran and resident of San Antonio, Texas, whose driver's license is suspended for unpaid DRP surcharges.

67.     Nathan Alexander is a 35-year-old resident of San Antonio, Texas, and whose driver's license is suspended for unpaid DRP surcharges.

68.     Defendant Steven Mach is the Chair of the Texas Public Safety Commission, which "controls" the Department of Public Safety and oversees its actions and functions.  *See* Tex. Code Ann. § 411.003(a).  Mr. Mach was appointed as chairperson of the Department of Public Safety by Governor Abbott and serves at the Governor's pleasure.  *Id.* at § 411.003(c). As chairperson of the Department of Public Safety, Mr. Mach enforces the DRP program against Texans.  Mr. Mach is sued in his official capacity.

69.     Defendant Steven McCraw is the Director of the Texas Department of Public Safety (DPS).  Defendant McCraw oversees and is ultimately responsible for all actions of DPS, which has exclusive authority over administration of the "Driver Responsibility Program" and assesses and collects surcharges from holders of Texas drivers' licenses pursuant to that program.  *See, e.g.*, Tex. Transp. Code Ann. §§ 708.053, 708.054, 708.151, and 708.152.  As Director of DPS, Mr. McCraw enforces the DRP program against Texans.  Defendant McCraw is sued in his official capacity.

70.     Defendant Sklyor Hearn is the Deputy Director of Administration and Services of the Texas Department of Public Safety.  Mr. Hearn oversees and is responsible for seven of the Department of Public Safety's subdivisions, including the Driver License Division.  *Texas DPS Organizational Chart*, Texas Department of Public Safety (Dec. 2017).[3]  As Deputy Director of Administration and Services at DPS, Mr. Hearn enforces the DRP against Texans.  Mr. Hearn is sued in his official capacity.

71.     Defendant Amanda Arriaga is the Division Director of the Driver License

---

[3] https://www.dps.texas.gov/orgchart/OrgChart.pdf

Division of the Texas Department of Public Safety. *See id.*   Ms. Arriaga oversees and is responsible for the actions of the Driver License Division, which handles DRP license suspensions.  As Division Director of the Driver License Division at DPS, Ms. Arriaga enforces the DRP program against Texans. Ms. Arriaga is sued in her official capacity.

72.     Defendant Greg Abbott is the Governor of the State of Texas.  As Governor, Mr. Abbott is the head of the executive branch of the Texas state government and is responsible for enforcing state law, including the DRP program.  He oversees and appoints the members of the Public Safety Commission, which controls the Department of Public Safety.  *See* Tex. Code Ann. § 411.003.  Mr. Abbott is sued in his official capacity as the Governor of Texas.

73.     At all times relevant to the events, acts, and/or omissions alleged in this Complaint, Defendants have acted under color of state law pursuant to their authority and responsibilities as officials of the state of Texas.

### **Factual Background**

74.      The State of Texas imposes, through the state officials of the Department of Public Safety and the Public Safety Commission, additional and punitive surcharges on individuals with certain traffic citations or convictions.    *See* Tex. Transp. Code Ann. §§ 708.102–708.104; 708.053.

75.     Nonpayment suspensions are imposed with no inquiry into whether the nonpayment was willful or the result of indigence.

76.     Defendants deposit roughly 50% of the revenue from DRP surcharges into the state's general revenue fund, and the other 50% into a dedicated fund for trauma facilities and higher education in the medical field.  Tex. Health & Safety Code Ann. §§ 780.002–780.004.

77.     This multi-million dollar revenue stream creates an incentive for Defendants to keep indebted individuals unaware of procedural protections, including relief programs and surcharge reductions, even if those individuals are living in poverty and eligible for such programs as required by state law.

78.     By far the most common citations that lead to license suspensions under the DRP are those that pose no danger to traffic safety and that instead correlate with poverty — lack of insurance, lack of a license, driving while a license is expired, and driving while a license is invalid. *See* Ex. 3, Public Information Request Response Letter from DPS at ¶ 4 (Jan. 23, 2018). Impoverished Texans disproportionately experience these offenses because they require money and resources up front — many people living in poverty struggle to keep up with insurance payments or to get to a DPS office during work hours and pay for license renewal.

79.     For each of these offenses, convicted individuals already receive punishment in the form of fines, incarceration, or license suspension before they are subjected to the additional punishment of the DRP.

80.     Lower-income Texans, already struggling to pay costs and fees, are the very last people who should be targeted by a convoluted and inaccessible debt-collection scheme that is purely punitive.   It is irrational to seek compliance for poverty-driven offenses by levying additional fees on drivers and threatening to take away their licenses — and thus their ability to find and keep employment — if they do not comply.

81.     During the disposition of their underlying traffic offense, individuals are not given any notice about the DRP surcharge program or their years-long obligations under it.

82.     There is no hearing or inquiry into a driver's ability to pay before additional and punitive surcharges are imposed under the DRP.

16

83.     There is no hearing or inquiry into a driver's ability to pay before their license is suspended under the DRP.

84.     Texas law requires that the Department of Public Safety waive all surcharges for impoverished individuals, and over the years, the failing program has been amended to include surcharge reduction programs to alleviate the severe burdens it imposes.  *See* Tex. Transp. Code Ann. §§ 708.157; 708.158.  However, Defendants make no meaningful attempt to comply with these procedural protections or to provide meaningful information about the purported surcharge reduction programs.

85.     Defendants send letters to individuals under the DRP that list only two ways to avoid license suspension: pay in full, or pay in automatically-set installment amounts.  More than half way down the letter, the Department includes only a single brief line mentioning the wealth-based alternative programs by their esoteric names, but does not define the term "Indigency" or provide explanatory or substantive information about the programs.  The reference to these programs is difficult to understand for most people, obscure, and simply does not put individuals on notice that they have alternative options if they are unable to pay.

86.     Not only does the letter fail to provide adequate information to help people avoid wealth-based license suspensions, but it operates to significantly disadvantage impoverished individuals.  To get any substantive information about the waiver programs — which many people would not realize were applicable to them — reliable internet and phone access are required, which many lower-income individuals lack.

87.     Even for those with reliable phone and internet service, Defendants' administration of the purported relief programs is so riddled with administrative hurdles,

technological impediments, and insurmountable barriers that it is unavailing for individuals living in poverty.

88.     The onus placed on individuals living in poverty to discover the existence of poverty-based alternatives, find information about them, and compile the proper documentation through an opaque process to avoid losing their driver's license is simply too high.

89.     The procedural inadequacies in Defendants' scheme are so significant that many Texans under the DRP are wholly unaware that they have hundreds or thousands of dollars in outstanding surcharges or that their license has been suspended until they attempt to renew their license or retain counsel on an unrelated matter.

90.     The lack of procedural protections surrounding the DRP's implementation disadvantages lower-income individuals and contravenes the explicit protections for impoverished individuals in Texas's law.

91.     Moreover, the wealth discrimination inherent in the operation of the DRP is particularly problematic because it disproportionately affects Texas's people of color.  In Texas, Black males are nearly three times more likely to be subjected to a traffic stop than White women.  Baumgartner, et al., "Racial Disparities in Traffic Stop Outcomes," Duke Forum for L. & Soc. Change, p. 45 (2017).[4]  A comprehensive study of DPS traffic stop data between 2009 and 2014 found "a persistent and significant gap in the treatment of Whites and Hispanics in traffic stops, where White drivers are much more likely to receive a warning than their Hispanic counterparts" and concluded that this disparity was not limited to the border, but was instead statewide.  Border Network for Human Rights, "Race, Traffic Stops and Ensuring Public Safety

---

[4] https://fbaum.unc.edu/articles/RacialDisparitiesInTrafficStops.pdf

for a Changing Texas" at p. 14 (2016).[5]   Because Texas's people of color are more likely to be stopped while driving and more likely to be issued formal citations than warnings, they are disproportionately subjected to the debilitating effects of Defendants' wealth-based license suspension scheme.

92.     License suspension can easily lead to accumulation of a criminal record simply due to inadequate and discriminatory process.  Individuals who drive on a suspended license in Texas can be charged with a Class B or C misdemeanor for driving while suspended, creating an inescapable cycle of additional fines, fees, surcharges, and entanglement with the criminal system.  *See* Tex. Transp. Code Ann. § 521.457.

93.     Defendants' lack of procedural protection works to significantly disadvantage the state's most impoverished and vulnerable drivers: surcharges are automatically imposed; nonpayment suspensions are automatic with no inquiry into an individual's ability to pay; information about the DRP is difficult if not impossible to obtain; Defendants provide only opaque and inaccessible pre-deprivation references to relief programs for those unable to pay their surcharges; Defendants provide no pre-deprivation substantive information about how to obtain relief under these programs; and access to digital resources and bureaucratic impediments make relief difficult if not impossible for poorer individuals to obtain.

### A.     Plaintiffs' Inability to Pay Surcharges Keeps Them in a Perpetual State of License Suspension and Hardship

94.     Plaintiffs are lower-income Texans whose licenses have been suspended because they cannot afford to pay the surcharge amounts they owe to the state under the DRP.

#### i.     Graciela Rodriguez

---

[5] http://bnhr.org/wp-content/uploads/2016/04/DPS-Report.pdf

95.     Graciela Rodriguez is a 76-year-old woman with a suspended Texas license who must take three different buses for five hours to get to work each day.  *See* Ex. 4, Rodriguez Decl.

96.     In 2010, Ms. Rodriguez received a citation for driving without insurance when a truck ran into her car while she was driving back from leaving flowers at a cemetery.

97.     Defendants automatically imposed DRP surcharges against Ms. Rodriguez as a result of her citation without inquiry into her ability to pay.

98.     Over several years, Ms. Rodriguez worked to pay off the $400 fee for her no-insurance citation as well as a $100 license reinstatement fee, but she did not know she had been subjected to additional punishment and fees under the DRP.

99.     At the time of her suspension, Ms. Rodriguez could not afford to pay hundreds of dollars in surcharges.

100.    In approximately early 2017, Ms. Rodriguez went to the Department of Public Safety to renew her license.  There she found out that her license was suspended for unpaid DRP surcharges and her renewal was denied.

101.    This was the first time Ms. Rodriguez had heard of the DRP or any outstanding surcharge debt against her.

102.    Ms. Rodriguez never received any pre-suspension notice about the Driver Responsibility Program, any notice of her surcharges, or any notice of available alternatives.

103.    While at the Department of Public Safety, Ms. Rodriguez overheard many people finding out that they also had suspensions under the DRP, and they too had no notice or prior knowledge of their surcharges whatsoever.

104.    At some point DPS entered Ms. Rodriguez into an installment plan, but she does not know how she was entered into the plan or how her fee was calculated.

105.    Ms. Rodriguez never received any notice about the payment plan and no hearing or ability-to-pay inquiry regarding her monthly payments.  She never received any notice from the Department of Public Safety regarding alternative options for individuals struggling financially — her only option was to pay in full, or pay in the monthly installments determined by DPS.

106.    Since finding out her license was suspended under the DRP, Ms. Rodriguez has called the DPS payment line a few times when she had a little extra money to put toward her surcharges.  She estimates she made three payments over the last year.

107.    Each time Ms. Rodriguez made a surcharge payment, the automated phone line simply accepted her money and hung up on her.  She was not offered the option to speak to an individual and she was not given any information as to whether she could have her license reinstated while making payments.

108.    Ms. Rodriguez has never been provided with any written information about the DRP surcharge program.

109.    Ms. Rodriguez has tried to get information from Defendants about her surcharges and her payment plan, but each time it has been futile.  She does not believe it is possible to get substantive or helpful information from the Department of Public Safety regarding surcharges.

110.    Ms. Rodriguez owes approximately $600 in DRP surcharges, and her monthly payments under her installment plan are $13.33 per month.  If Ms. Rodriguez could regularly afford her payments — which she cannot — it would take her nearly four years to pay off her surcharges.

111.    Ms. Rodriguez has attempted to make payments on her outstanding surcharges, but she cannot afford her monthly payments and has gone into default multiple times.

112.    Defendants inform individuals subject to the DRP that "you must make payment each month, or your account will default and your driving privileges will be suspended."

113.    Ms. Rodriguez's DPS documents indicate that she most recently went into default on her $13.33 installment payments in April 2017.

114.    Ms. Rodriguez has occasionally been able to make surcharge payments since then, but she has also involuntarily defaulted because she could not afford the payments.

115.    For many years, Ms. Rodriguez worked as a certified nurse's assistant.  For nearly thirty of those years, Ms. Rodriguez worked as a school nurse.  After a lifetime of hard work, she can't work quite as much.

116.    Ms. Rodriguez receives Supplemental Security Income, which does not fully cover her basic expenses.  To make ends meet, she must work four to five days a week as an in-home caregiver, often providing elder care services for individuals younger than her.

117.    Because she cannot afford her DRP surcharges and thus her license is suspended, Ms. Rodriguez must take public transportation to and from work.

118.    Ms. Rodriguez's clients are not accessible by any direct public transit, so she must take three different buses to get to work each day.  Her commute is five hours long.

119.    Ms. Rodriguez must take the bus to go to the doctor, grocery shopping, to visit family, and to carry out other daily activities.  This is especially hard on Ms. Rodriguez in the summer because she takes medications that make it dangerous for her to be exposed to heat.

120.    On one occasion, after being on the bus for a long period of time, Ms. Rodriguez had to be rushed to the hospital because she was dangerously overheated.

121.    Because of the danger posed by public transportation and her license suspension, Ms. Rodriguez is now restricted from seeing her five children, eighteen grandchildren, and sixteen great grandchildren.

122.    Prior to her license suspension, Ms. Rodriguez saw her family multiple times a week.  Now she often goes weeks without seeing them at all.

### ii.    Charles Stevens

123.    Charles Stevens is a 40-year-old Navy veteran and Texas resident.  *See* Ex. 5, Stevens Decl.  He has a newborn son with whom he enjoys spending time.

124.    In 2011, Mr. Stevens received a DWI in San Antonio.  He has been sober since then.

125.    Defendants automatically imposed DRP surcharges against Mr. Stevens.

126.    Mr. Stevens never received any notice that, in addition to the penalties for his DWI, he had surcharges under the DRP imposed against him.  He never received any information about the DRP programs, his outstanding fees, or alternatives to payment in full.

127.    Mr. Stevens' license was suspended in or around 2013 for nonpayment of his DRP surcharges without inquiry into his ability to pay.

128.    At the time of his suspension, Mr. Stevens was unable to pay thousands of dollars in surcharges.

129.    In 2012, Mr. Stevens moved out of the state.  He returned to Texas in May of 2017.  Upon returning, he tried to renew his Texas license but was denied.  He did not know why and was not given an explanation.

130.    It was not until retaining free legal counsel that Mr. Stevens found out for the first time he owed $3,120 under the Driver Responsibility Program and that his license was suspended and would remain suspended until his surcharges were paid.

131.    Mr. Stevens actively sought work for a year and a half after returning to Texas, but he had difficulty finding employment that was accessible by public transportation or that did not require a valid driver's license.

132.    Mr. Stevens recently secured a low-wage job working a graveyard shift at a packaging facility for $10 an hour.  The job is not accessible by public transportation.

133.    Mr. Stevens' wife has a full-time job that pays $15 an hour and was previously was the sole source of income for their family.  Mr. Stevens' wife is on an extended period of time off work after giving birth, and now Mr. Stevens' low-wage job is the sole source of income for their family, including their newborn son.

134.    Mr. Stevens' wife must drive him to and from work in the middle of the night while also caring for their newborn child.  When she begins work again, she will have to drive both herself and Mr. Stevens to work virtually around the clock.

135.    During the holidays, Mr. Stevens will be volunteering to help the less fortunate. Ironically, his own income is exceeded by his family's daily costs of living and the costs of a newborn baby.  Mr. Stevens and his wife recently were forced to move in with their relatives because they could no longer afford to live in their home.  Mr. Stevens cannot afford a home for his family, let alone thousands of dollars in surcharge fees.

136.    While the Department of Public Safety has never provided Mr. Stevens with any written notice about the DRP or his surcharges, a legal aid services provider for impoverished individuals informed him that based on his household income he is only eligible for, at most, a 50% reduction in his surcharges.  This reduction is not guaranteed, requires legal assistance to pursue, and the amount is automatic — it is not set based on an individualized ability-to-pay inquiry or hearing of any type.

137.    Because of his family's extremely limited income and their necessary daily expenses, even if Mr. Stevens eventually receives a 50% reduction in his surcharge debt, he would not be able to pay off the more than $1,500 in surcharges that would remain.

138.    Because of Defendants' DRP and his inability to pay his surcharges, Mr. Stevens' license — and therefore his ability to get himself to work and care for his infant son — is indefinitely suspended.

### iii.    Khalid Salahuddin

139.    Khalid Salahuddin is a 40-year-old Navy Veteran who has a disability and is a San Antonio resident.  Ex. 6, Salahuddin Decl.

140.    Mr. Salahuddin had a tough life growing up on the east side of San Antonio. While his mother raised him when she could, he spent nearly a decade in a children's home.  He had a child as a teenager.  Still, Mr. Salahuddin went to school, attended church, and played sports to stay out of trouble.  He always wanted to rise above his circumstances and make something better of himself, so he decided to serve his country by joining the Navy.

141.    While on active duty in 2003, Mr. Salahuddin was driving his car when another driver drove through a red light and crashed into his car.  The injuries caused by the other driver put him in the hospital and did extensive damage to his car.

142.    At the time, Mr. Salahuddin was having difficulty affording insurance because of extreme financial hardship.  Not only did he sustain injuries and a hospital stay from the accident, but he also got a ticket from DPS for driving without insurance.

143.    Defendants automatically imposed DRP surcharges against Mr. Salahuddin.

144.    Mr. Salahuddin never received any notice that he had surcharges imposed against him as a result of this or another traffic infraction he got.  Neither did Mr. Salahuddin receive

any notice about the Driver Responsibility Program in general, nor any alternative payment options he could apply for to avoid a license suspension.

145.    Unbeknownst to him, Mr. Salahuddin's driver's license was suspended due to nonpayment of DRP surcharges without inquiry into his ability to pay.

146.    At the time of his suspension, Mr. Salahuddin was unable to pay his surcharges.

147.    Soon thereafter, Mr. Salahuddin was stationed in California and moved there with his wife.  He lived there for many years.

148.    In 2010 Mr. Salahuddin sustained serious injuries as the result of an accident, and he now has a very limited range of mobility and is unable to stand for more than a few minutes at a time.  Mr. Salahuddin's Veterans Affairs Disability Rating is 80%.

149.    In spite of his disability, Mr. Salahuddin continued to serve his country and was honorably discharged from the Navy after more than a decade of service.

150.    Mr. Salahuddin's disability made it very difficult to find employment.  After his honorable discharge from the Navy, he experienced homelessness off and on for several years.

151.    Even though he was always struggling with money, Mr. Salahuddin tried to support his family and better himself.  Mr. Salahuddin went to school when he could.  Not only did he obtain a bachelor's degree, but he earned an MBA as well.  When he returned to Texas in 2017, Mr. Salahuddin hoped that he could get a good job and put his long-time financial worries behind him.

152.    Even though his physical limitations made it more difficult for him to find employment, Mr. Salahuddin was able to secure a good job offer.  However, it required that he have a Texas driver's license. So Mr. Salahuddin attempted to renew his Texas license, but

Defendants denied it to him without explanation.  He had to retain free legal counsel in order to determine that his license had been suspended due to nonpayment under the DRP.

153.    When Mr. Salahuddin's prospective employer found out his license was suspended, it rescinded the job offer to him.  He was able to secure another job offer, but again, the offer was rescinded when his potential employer found out his license was suspended.

154.    With the advice of counsel — but still with no notice or information provided by the Department of Safety — Mr. Salahuddin contacted the Department of Public Safety in late 2017 or early 2018.  It informed him that he owed approximately $780 in DRP surcharge fees, and put him on a monthly payment plan.

155.     Mr. Salahuddin's minimum monthly payment was determined automatically; he received no individualized inquiry or determination of his ability to pay the monthly payments assigned to him under the payment plan.

156.    Within the last one or two months, Mr. Salahuddin contacted the Department of Public Safety with the assistance of free legal counsel.  He was informed that his surcharges now calculate to approximately $2,000.

157.    Mr. Salahuddin is unsure why his surcharge amount drastically increased.

158.    DPS also told Mr. Salahuddin that he would automatically receive his renewed driver's license as soon as his first payment was made.  This was not true.  He never received his driver's license even though he made installment payments.

159.    Mr. Salahuddin receives $1,920 per month in Veteran's Disability benefits, but the rent and expenses he must pay to support his children are over $2,000 a month.  Sometimes he can get jobs that do not require a driver's license through a temporary employment agency, but still struggles to pay his bills.

160.    Mr. Salahuddin cannot afford to pay all his obligations and his minimum daily expenses, let alone additional and punitive DRP surcharges.

161.    Even at a monthly payment of $13.33, Mr. Salahuddin had to default on his monthly payment plan in 2017 after making his first payment.  In 2018, he was able to make two surcharge payments, but again fell into default because he could not afford the extra monthly expense.

162.    Defendants' suspension of Mr. Salahuddin's license causes him to choose between breaking the law and endangering his health.  He must go to physical therapy five to seven times a month, but because his disability leaves him unable to stand for prolonged periods, he cannot take public transportation to his appointments.  His only option is to drive.

163.    Mr. Salahuddin owes approximately $2,000 in surcharges.  The alternatives he has sought from the Department of Public Safety have not afforded him meaningful process and have been insufficient to put him back on the path to lawful driving.

164.    If Mr. Salahuddin were able to pay his surcharges, he would be immediately eligible for a driver's license — and thus he would likely be able to obtain a higher-paying job, support his family, and access his necessary medical care without risking criminal sanctions.

### iv.    Nathan Alexander

165.    Nathan Alexander is a 35-year-old man who lives in sober living house in San Antonio, Texas.  Mr. Alexander moved into the sober living house earlier this month from Haven for Hope, a shelter for homeless individuals, because his time there had expired. Before leaving, he completed the shelter's one-year sobriety program.

166.    In November 2017, while living with untreated addiction, Mr. Alexander got a DWI in San Antonio.

167.    Defendants automatically imposed DRP surcharges against Mr. Alexander.

28

168.    Shortly after his conviction, Mr. Alexander received notices in the mail informing him that he would have $3,000 in surcharge fees imposed against him.

169.    The surcharge notices did not include any information about relief programs, alternatives, or other options other than payment of the surcharge fees.  The notices indicated that license suspension would be automatic if Mr. Alexander did not pay, without an inquiry into ability to pay or a hearing.

170.    Mr. Alexander was in state-ordered treatment when he received the notices and he could not physically leave the facility at the time, let alone earn thousands of dollars to pay his surcharges.  In addition, he was destitute and had no savings whatsoever.

171.    Because he could not afford the DRP surcharges and knew of no other alternatives to payment in full — which he was unable to do — Mr. Alexander believed his license suspension to be inevitable.

172.    Mr. Alexander's license was suspended for nonpayment of DRP surcharges without inquiry into his ability to pay.

173.    Mr. Alexander could not afford to pay his surcharges at the time his suspension was enforced against him.

174.    Since his conviction, Mr. Alexander has been living at a shelter for homeless individuals, and more recently, in a sober living house.  He has been sober for over a year and is attempting to reform and reenter society.  He now serves as a sponsor for several other individuals in recovery.

175.    Indeed, out of many sober living houses, Mr. Alexander chose to move to the specific sober living house he now resides in because it was considered a "struggling house" and was in danger of shutting down.  The sober living house was having trouble retaining its

housemembers and collecting rent. Mr. Alexander and three other individuals from the homeless shelter decided to move into the house to try to give it stability and act as a positive influence for others in the house.

176. Mr. Alexander immediately took a leadership role and is serving on the sober living house's fundraising committee. He is helping the house to get back into a stable financial position so that it does not have to close down and discontinue its services.

177. Mr. Alexander is also actively working to ensure the success and continued sobriety of the other members of the house. When he first moved into the house earlier this month, it only had one member maintaining sobriety. Now, it has six.

178. Mr. Alexander has also been nominated to be the president of one of the recovery groups back at Haven for Hope. He travels four hours by bus every Monday to attend those meetings at the shelter.

179. Mr. Alexander serves as a sponsor for other individuals trying to stay sober, but his license suspension makes this work extremely difficult to do and sometimes jeopardizes his success. Recently, one of Mr. Alexander's sponsees called him in crisis, afraid that he was going to relapse. He desperately wanted to see Mr. Alexander in person for support, but Mr. Alexander could not drive to him, and it would have taken two hours to get to him by bus.

180. Because his license is suspended under the DRP, Mr. Alexander was unable to provide crucial assistance to one of his sponsees in need. Instead, he had to attempt to mentor his sponsee over the phone, and advise him to find someone who could be available to drive him to recovery meetings in emergency situations.

181. Up until 2016, Mr. Alexander worked as an insurance restoration estimator. While he was at the Haven for Hope shelter, he received two job offers to return to insurance

restoration estimation work with salaries between $70,000 and $80,000. For both jobs, a valid driver's license was a necessary prerequisite.

182. Mr. Alexander would be eligible for an Occupational Limited License if not for his DRP suspension. However, because suspensions for unpaid DRP surcharges operate as a complete bar to all driving — including with an OLL — Mr. Alexander was forced to turn down these high-paying jobs for which he is qualified.

183. In December 2017, the Haven for Hope shelter helped Mr. Alexander get a dishwashing job at a local brewery.

184. When he gained employment, the shelter began to charge Mr. Alexander approximately $200 a month in rent. These payments were extremely difficult to make based on his low wages, even though he picks up extra shifts whenever he can.

185. Since moving to the sober living house, Mr. Alexander's rent has increased to $500 a month.

186. Because of his DRP license suspension, Mr. Alexander must take the bus an hour each way to work. If he could drive, his commute would be 20 minutes.

187. The bus only comes to the stop near the sober living house every thirty minutes on weekdays and only once an hour on weekends. With his bus commute included, Mr. Alexander's work shifts take approximately twelve hours each day.

188. When his work hours do not coincide with the schedule of the single bus that serves his shelter, Mr. Alexander must make different arrangements with his boss or try to find someone to drive him to or from work. In addition, Mr. Alexander is surrounded by alcohol at his dishwashing job as he tries to maintain his sobriety.

189.    During his crucial period of recovery, Mr. Alexander must take the bus to and from addiction services meetings several times a week, with some trips taking up to two hours each way.

190.    Prior to his conviction, Mr. Alexander saw his two young children, who live nearly twenty-five miles away and are inaccessible by public transportation, approximately four times a week.

191.    Since Defendants suspended his license in November 2017, Mr. Alexander has been prevented from seeing his children.

192.    Without a driver's license or a steady job, Mr. Alexander fears he will never see his children with frequency or regularity again.

193.    In February or March of 2018, Mr. Alexander retained free legal counsel to help him with a number of issues.  It was only then that he learned of surcharge reduction programs under the DRP for the first time.

194.    With legal assistance, Mr. Alexander filed an application for waiver of his outstanding $3,432 in surcharges.

195.    Despite his indigence, Defendants denied Mr. Alexander a waiver in surcharge fees.

196.    Instead Mr. Alexander received a reduction down to $1,300, due January 5, 2019. Mr. Alexander was not provided any information on how or why this date was chosen, and was given no information about any opportunity to be heard on its feasibility.

197.    Mr. Alexander is unaware what informed the amount of his surcharge reduction — no inquiry was conducted into Mr. Alexander's ability to pay $1,300 in surcharges, and he

was not given a hearing or opportunity to demonstrate his financial circumstances or inability to pay.

198.    As a dishwasher, Mr. Alexander makes approximately $1,200 to 1,300 a month. His rent at the sober living house and expenses he must pay to support his children total at $1,800 a month.

199.    Mr. Alexander is transitioning out of homelessness, impoverished, and attempting to overcome a conviction and reenter society in a positive way.  Despite working full time, he does not have enough money to pay his rent and court-ordered obligations, let alone over a thousand dollars in additional and punitive surcharges.

200.    It will be virtually impossible for Mr. Alexander to pay $1,300 to the Department of Safety by January 5, 2019.

201.    If Mr. Alexander were able to pay his DRP surcharges or if they were waived, he would be immediately eligible for an Occupational Limited License.  He could reconnect with his family and resume his specialized career rather than working at a dishwashing job that forces him to be surrounded by alcohol as he tries to successfully reenter society.

202.    Instead, Mr. Alexander's license will be suspended indefinitely until he is able — if ever — to pay off his surcharges.

B.    **Defendants' Complex and Debilitating Surcharge Scheme Creates Insurmountable Hurdles for the State's Most Impoverished and Vulnerable Individuals**

203.    The Department of Public Safety is required by Texas law to waive all surcharges for individuals who are impoverished.  Tex. Transp. Code § 708.158.  Yet Defendants ignore this mandate and automatically suspend licenses for nonpayment without giving notice that is reasonably calculated to inform impoverished individuals of the availability of alternative procedures that would help them avoid license suspension.

33

204.    Pursuant to Texas law, the Department must offer programs for reduction of DRP surcharges, decreased length of an installment plan, and an "indigency program," which is left undefined in Texas law.  *See* Tex. Transp. Code § 708.157.

205.    However, because the DRP is a source of state revenue, Defendants are incentivized to keep lower-income individuals unaware of these programs, instead relying on the hardship of license suspensions to coerce payment from those who cannot afford to pay.

206.    Both the enforcement of the DRP by the Department of Public Safety and the DRP statutes on their face create opaque, insurmountable hurdles for lower-income drivers and deprive them of meaningful due process for protecting their licenses.

207.    When Defendants send notice to debtors about the DRP, the sole reference to alternatives for impoverished drivers reads: "You may also use this [payment] website to apply for either the Indigency or Incentive surcharge balance reduction programs."  *See* Ex. 2.

208.    Without more information, individuals — especially lower-income individuals with less education — have no way of knowing what this means or what these programs are.

209.    This letter is not reasonably calculated to inform individuals who cannot pay their surcharges about available procedures to help them avoid a wealth-based license suspension.

210.    Notices sent under the DRP threaten license suspension for nonpayment, but include no information on obtaining a financial waiver, no information that might signal to an impoverished person that alternative options apply to them, and no information about the process for obtaining relief.  *Id.*

211.    This single line does not constitute meaningful pre-deprivation notice because of its inconspicuous placement on the notice among numerous, large-font, bolded license suspension threats and payment demands.  Even worse, the letter does not define "indigency,"

does not give any indication of whom the programs apply to, and does not provide further information for how to apply for the programs.

212.   Instead, Defendants only provide explicit notice of two ways to avoid suspension of their license: pay in full or pay installation payment amounts determined automatically by the state.  *See* Ex. 2.  The letter includes no information regarding adjustments of payment plan amounts or whether such an option exists.

213.   In short, the letter sent to debtors under the DRP is devoid of any substantive information or explanation that might put an impoverished individual on notice that they can avoid indefinite license suspension due to their poverty.

214.   In addition, the vague website instruction cannot provide meaningful notice to individuals unable to afford their surcharges because impoverished individuals are often without personal internet access.  Indeed, less than 50 percent of households living in poverty have internet accessible in their homes.  U.S. Dept. of Housing and Urban Development, *Digital Inequality and Low Income Households* (2016).[6]

215.   Even for individuals who have internet access, the Texas Surcharge Online website does not provide meaningful notice or opportunity to access alternatives to payment. Many individuals cannot navigate past the initial page to get information to begin the indigence application process, as it requires information that individuals subject to the DRP have no way of accessing.  *See* Ex. 1, Decl. of Leslie Ginzel at ¶ 10 ("The online application requires the name, date of birth, social security number and zip code associated with your account for online access. We routinely find that the associated zip code has no relation to the applicant's address with DPS

---

[6] https://www.huduser.gov/portal/periodicals/em/fall16/highlight2.html

or any address they have used in years.  It is a guessing game, which often results in being locked out of the system.").

216.    The only other information in the letters about steps an indebted individual can take reads: "*DO NOT MAIL CASH* . . . You may contact a Program Specialist regarding your surcharge account at (800) 688-6882, or use this number to make a payment using the automated phone payment system."  *See* Ex. 2.

217.    This option does not make any mention of alternatives for impoverished individuals and does not explain or even identify the surcharge reduction programs.

218.    Individuals who are able to call via the telephone option do not receive meaningful notice or opportunity to access alternatives to payment in full in order to avoid license suspension.  Again, the automated phone line requires an associated zip code, which remains a mystery to many applicants, before they can even begin an application.

219.    At no point does the automated telephone option offer the opportunity to speak to a live person about the purported relief programs and how to apply for them.

220.    It is virtually impossible to receive proper pre-deprivation notice, opportunity, or any information at all regarding DRP payment alternatives by speaking to a "Program Specialist" on the phone — pressing "0" to speak to a specialist inevitably ends up in the caller being re-routed to the automated main menu or automatically disconnected.  *See* Ex. 8, Decl. of Judge Zaragoza at ¶ 6 ("Digital divide and low-literacy levels make it almost impossible for poor people to access assistance or information through DPS or Municipal Services Bureau (MSB), the entity that DPS contracts with to manage surcharge collection.  Almost all calls to DPS or MSB involve wait times of 45 minutes or longer.  Many times, the caller is disconnected after a message that announces "We are experiencing a high call Volume – call back later".  Since the

phone lines are only open on Monday through Friday, with only very limited access to MSB on Saturday, the ability of low-wage workers to access the system is limited. Also, for individuals with pay-as-you-go phone plans, obtaining information is difficult and expensive. Many just give up.").

221.    The notices sent by the Department of Public Safety do not adequately provide meaningful notice about surcharge waiver programs, and the resources listed simply operate to stonewall lower-income drivers rather than provide them with due process.

222.    As a result, impoverished Texans subject to the DRP cannot access meaningful information about alternatives to payment or how to apply for them, and thus have no meaningful opportunities to avoid license suspension due to poverty.

223.    The utter lack of access to information about wealth-based waivers and reductions is all the more egregious given that the Department of Public Safety is required by law to waive surcharges for individuals living in poverty.

224.    The Department does not try to avoid poverty-based license suspensions by taking any action itself. Instead it places the onus on drivers to discover alternative programs, figure out their requirements, and submit the necessary documents.

225.    There is no reasonable expectation that an impoverished person would look to the laws of the state to determine the necessary actions they must take to avoid losing their license simply due to poverty.

226.    The notices sent by DPS are inaccessible and do not put individuals on notice that alternative plans exist.

227.    Even if an individual were somehow able to discern from the single line on the letter sent by DPS that wealth-based alternatives programs existed and that they were eligible to

apply, and even if they went searching through the Texas statutory scheme to try to avoid losing their license due to poverty, the DRP laws themselves are unconstitutionally vague and provide no meaningful reprieve.

228.    Under the provisions for what is known on the Department's notices as the "Indigency Program" — although it is not referred to by that name in the statute and would be extremely difficult to find for a layperson — acceptable forms of proof of indigence are listed. *See* Tex. Transp. Code Ann. § 708.158.

229.    However, no information is given on how to submit that proof to the court, or what an individual can do to receive an individualized ability-to-pay inquiry if they cannot access those documents or if the documents do not exist.  *See id.*

230.    It is unclear from the face of the statute whether any options exist for impoverished individuals who do not have access to the enumerated documents, or whether options exist for individuals with income over 125% of the Federal Poverty Line.  *See id.*

231.    Under the provisions for what is known on the Department's notices as the "Incentive Program" — although it is not referred to by that name in the statute and would be difficult to find for a layperson — there is literally no information to put the public on notice of the eligibility requirements or application processes for the Incentive Program.  *See* Tex. Transp. Code Ann. § 708.157.  The statute merely states that the Department of Public Safety "may establish a periodic amnesty program . . . as determined by the department," and that it will establish "rules" for reductions and waivers of surcharges, decreases in installment plan length, and the "establish[ment] of an indigency program . . . as determined by the department."  *See id.*

232.    The statute does not define "amnesty program," "reduction of a surcharge," or "indigency program."  *See id*; *see also* Tex. Transp. Code Ann. § 708.001 (DRP Definitions).

233.     These "rules" established by the Department of Public Safety are not enumerated in the statute and are not provided to people affected by the DRP in the letters sent to them.

234.     Because the Department's operation of the DRP is so procedurally inadequate, many individuals do not know that the DRP exists at all, much less what alternative options exist and where to look for information about them.  *See* Ex. 1, Decl. of Leslie Ginzel at ¶ 7–8 ("Even 15 years after the DRP was enacted, most Texans and their legal counsel, if they can afford it, have no familiarity with the surcharge program"); Ex. 8, Decl. of Judge Zaragoza at ¶ 4; ("[M]ost drivers and most lawyers have no familiarity with the surcharge program, and have no idea that convictions for No Insurance and Driving with an Invalid License citations will result in the imposition of fees of $250 per year for 3 years, for each conviction.").

235.     For many Texans, the information provided by the Department is so inadequate it requires retention of counsel — a difficult or impossible feat for impoverished individuals — before they become aware that alternatives to payment in full exist.

236.     Few attorneys in the state are aware of the availability of balance reduction programs under the DRP or how to obtain them.  Even fewer impoverished drivers can navigate this process with no eligibility information or procedural information provided by the state.  *See* Ex. 8, Decl. of Judge Zaragoza at ¶ 7 ("[T]here are probably less than a handful of lawyers in Texas who are familiar with securing waivers of DPS surcharges . . . [v]ery few low-income Texans have access to someone who can help them with surcharge waivers."); Ex. 1, Decl. of Leslie Ginzel at ¶ 10 ("[A]ccess to the program can be confusing and clients are often unable to navigate it by themselves if they are lucky enough to learn of its existence.").

237.     Even if an individual can access information about available alternatives to payment in full on her own — usually after her license has already been suspended —

applications for financial relief place the burden on the impoverished driver, requiring her to gather and provide certain documentation to the court, such as federal income tax returns or documentation of showing receipt of public assistance. Tex. Transp. Code Ann. § 708.158. There is no facial alternative for individuals who cannot access this documentation.

238.   For individuals with income between 125–300% of the Federal Poverty Line, the Department's surcharge reduction program is limited to a one-size-fits-all reduction in surcharge fees at a rate of 50% and requires that the reduced surcharge be paid within six months without exception.

239.   The 50% surcharge reduction is automatic — it does not include any individualized ability-to-pay inquiry and does not take into account an individual's employment status, health, housing situation, family size, expenses, court-ordered fines and fees, or other mitigating factors.

240.   Individuals who apply for this reduction — many of whom cannot pay even 50% of their surcharge fees — are offered no meaningful process or opportunity to seek a lower reduction or to be heard on their ability to pay.

241.   Individuals who cannot pay this reduced amount will have their licenses suspended.

242.   Individuals with income over 300% of the Federal Poverty Line are ineligible for any debt relief whatsoever under the DRP surcharge program, regardless of family size, medical and other expenses, rent and insurance payments, other court-ordered obligations, or any other factor affecting one's ability to pay.

243. Many individuals, even if their income exceeds 300% of the FPL, may be struggling financially with medical bills, supporting their family, and keeping up with the basic necessities of life.

244. The DRP does not provide any way for these individuals to show that they are unable — as opposed to unwilling — to pay their additional and punitive surcharges.

245. If these individuals cannot pay their surcharges in full, their licenses will be automatically suspended.

246. Individuals who are ineligible for any surcharge reduction because their income does not meet the DRP's Federal Poverty Line requirement — even if they are living in poverty — are given monthly payment plans that require payment of the full sum of the surcharge, even if it takes years to collect or, more likely, it is never collected at all.

247. The monthly payment plan amounts are determined automatically with no inquiry into an individual's financial circumstances or individualized assessment of ability to pay.

248. Individuals who cannot pay these installment amounts have their licenses automatically suspended.

249. The state intends to collect the full amount of DRP surcharges as often as it can, despite the legal mandate that surcharges be waived in full for individuals living in poverty. Instead of lowering surcharge amounts based on inability to pay, Defendants put suspended individuals on payment plans that extend for years on end, and often indefinitely, until every cent of debt has been paid.

250. Even if an individual enters into a payment plan, her license will not be reinstated while making on-time payments. Thus wealthy individuals pay their surcharges immediately

and continue to drive, while poorer individuals live under an indefinite license suspension while they struggle to pay little by little, month by month.

251.    As part of a scheme of mounting debt that cripples the ability of impoverished Texans to escape the DRP surcharge program, the state charges what amounts to a payment plan fee for those who are too poor to pay their surcharges immediately: the state charges a $25 fee for any payment made 31 days or more after a fine or fee is assessed.  *See* Tex. Loc'l Gov. Code Ann. § 133.103(2).

252.    In addition, Texas law authorizes private debt collectors to pursue and profit off of individuals with outstanding surcharge debts.  Local governments can enter into collection contracts with private collection agencies to target indebted individuals, and these companies may charge up to a 30% collection fee from individuals under the DRP on top of the surcharge amounts already owed.  *See* Tex. Code Crim. Proc. Ann. art. 103.0031(3)(b).

**C.    Defendants' License Suspension Scheme Violates Procedural Due Process by Failing to Give Adequate Notice, Opportunity, or Individualized Assessments to Protect Lower-Income Drivers**

253.    A person's driver's license is recognized as a property interest that may not be taken away without due process of law.  *See Bell v. Burson*, 402 U.S. 535, 539 (1971).  Plaintiffs are entitled to meaningful notice and opportunity to be a heard *prior* to deprivation of a license. *See id.*

254.    Individuals are given no notice or information about the DRP during the adjudication of their underlying traffic offense, and any subsequent process is patently inadequate to protect the property interests of impoverished drivers.

255.    Texas law requires that the Department of Public Safety waive "all surcharges" for individuals who are "indigent."  Tex. Transp. Code Ann. § 708.158(a).  Yet the Department does not make a meaningful attempt to comply with this procedural protection.

42

256.     Instead, the Department places the onus on poor individuals with limited resources to apply for reductions and waivers under programs that are not specifically enumerated by law.  The Department gives woefully inadequate notice to lower-income drivers that these programs even exist.

257.     Because impoverished individuals have procedural protections under the DRP, due process requires the Department of Public Safety to conduct ability-to-pay inquiries when it sets installment payment prices that will serve as the basis of non-payment license deprivations and when it proposes to take coercive action, such as license suspensions, to punish nonpayment.

258.     Instead, the Department assesses surcharges automatically, sets automatic installment plan prices, and sends a letter demanding payment and threatening license suspension for nonpayment.  The Department then suspended licenses without an inquiry into whether nonpayment was voluntary.

259.     In the Department's letters, among the threats and payment demands, the Department includes only a brief line mentioning the wealth-based alternative programs by their esoteric names, but does not provide explanatory or substantive information about the programs.

260.     The Department offers no opportunity to be heard when setting payment plan installment amounts.

261.     The Department provides no notice when it automatically enters individuals into installment payment plans.

262.     Prior to suspending licenses, the Department provides no meaningful pre-deprivation notice regarding relief programs for individuals who are too poor to pay their surcharges, nor does it provide information on how to apply for such programs.  It offers only

one opaque line that is not reasonably calculated to put individuals on notice that alternative programs exist, what they are, who is eligible, and how to apply.

263.    Instead, the onus is on impoverished individuals not only to provide documentation of their poverty and submit it to the court, but also to find out for themselves that such options exist and how to access them.

264.    Finding substantive information about purported relief programs under the DRP is virtually impossible due to the administrative hurdles posed by the only options offered by the Department of Public Safety.

265.    Even though Texas law requires the Department to waive fees for impoverished drivers, when individuals apply for surcharge reductions, the Department reduces fees pursuant to an automatic scale and without an inquiry into the driver's financial status.

266.    Thus even lower-income individuals who avail themselves of available "process" are left with hundreds or thousands of dollars in fees that are still too high for them to pay in order to keep or reinstate their licenses.

267.    The Department conducts no inquiry into ability to pay the reduced debt, and offers no information about any opportunity to be heard when reducing surcharges beyond submitting documentation.

268.    The Department then suspended licenses without an inquiry into whether nonpayment was voluntary.

269.    Throughout every step of the DRP process, individuals living in poverty are presented with seemingly impossible choices; they are told they will lose their license if they do not pay, but they are given no notice of lawful alternatives to avoid license suspension; they are

given no meaningful notice or opportunity to access available alternatives; and they are given no individualized assessment or opportunity to be heard.

270.     The process provided by Defendants is prejudicial and wholly inadequate to protect lower-income individuals from the serious deprivation of a driver's license.

### D.     The Fourteenth Amendment Protects Against Punitive Consequences for Inability to Pay

271.     The Fourteenth Amendment of the United States Constitution prohibits punishing individuals for non-payment without first determining that they had the ability to pay and willfully refused to make a monetary payment. *See Bearden v. Georgia*, 461 U.S. 660 (1983).

272.     The equal protection and due process guarantees of the Fourteenth Amendment, taken together and as articulated in *Bearden*, form a protected expectation of fundamental fairness in government processes; the doctrine of fundamental fairness in government process prohibits Defendants from taking punitive action — like depriving individuals of their driver's licenses — based solely on their inability to pay. *See, e.g.*, *Bearden v. Georgia*, 461 U.S. 660, 660 (1983) (holding that it is fundamentally unfair to revoke probation because an individual is unable to pay fines); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (holding that it is fundamentally unfair to deny access to a trial transcript, thus increasing the chances of negative consequences on appeal, solely because of inability to pay); *Tate v. Short*, 401 U.S. 395, 395 (1971) (holding that it is fundamentally unfair to jail a person for inability to pay a fine); *Williams v. Illinois*, 399 U.S. 235, 240–41 (1970) (holding that it is fundamentally unfair to imprison a person beyond the maximum period fixed by statute solely because he cannot pay fines or court costs).

273.     Suspensions under the DRP are solely a penalty for failure to pay a monetary amount.     The DRP statutory scheme is entirely fee driven — it does not provide for or

contemplate license suspensions for public safety reasons, traffic safety reasons, or any reason other than failure to pay surcharges.

274.    Defendants take the punitive step of suspending driver's licenses without first determining whether the nonpayment of DRP surcharges was willful, or instead involuntary due to indigence.

275.    The Department of Public Safety enforces Texas's wealth-based suspension scheme without sufficiently noticing procedural paths to payment alternatives for those that cannot pay.

276.    Thus, Texas' wealth-based suspension scheme disproportionately punishes impoverished individuals and inevitably results in individuals being penalized for their inability to pay.

277.    This penalty is automatically enforced without an inquiry into an individual's willfulness in nonpayment.

278.    By converting a revenue-generating surcharge into a serious deprivation (an indefinitely suspended driver's license), Texas unfairly penalizes people who are poor simply for being poor.

279.    Accordingly, Defendants' wealth-based suspension scheme violates principles of due process, equal protection and fundamental fairness.

**E.    Defendants' License Suspension Scheme Violates Equal Protection**

280.    Defendants' surcharge collection scheme — which leverages an individual's vital ability to drive in order to coerce payment to the state — discriminates by (i) suspending the licenses of impoverished individuals, or elongating their suspension periods, simply because they cannot afford to pay, and (ii) subjects individuals to a harsher debt collection method because their debts are owed to the government rather than a private entity.

### i.   Texas' Wealth-Based Suspension Scheme Discriminates Against Impoverished Drivers

281.   Inherent in the procedurally faulty operation of the Driver Responsibility Program is a two-tiered system of justice: one for individuals wealthy enough to pay off their surcharges immediately, and the other for individuals who cannot afford to do so.

282.   Wealthy individuals with access to information, resources, and money can pay their surcharges immediately, never risking a day of license suspension.  By contrast, impoverished individuals are subjected to what is essentially an indefinite license suspension simply because they cannot afford to pay the surcharge amounts demanded by the state.

283.   Thus, individuals living in poverty suffer the daily hardship of living without a driver's license under the DRP while similarly situated individuals with more money do not.

284.   Disparity exists between those who can afford surcharges up front and those who cannot.  Individuals who must pay in installments remain in the DRP until they have finished paying off every penny — their licenses remain suspended the entire time they are making surcharge payments, even if it will take months or years to settle their debts.

285.   Because of the lack of proper notice, individualized determinations, and administrative accessibility, lower-income drivers are more likely to lose their licenses and are subsequently subjected to years-long or indefinite licenses suspensions.  If they are lucky enough to discover the existence of alternatives to payment in full, impoverished debtors are subject to lengthy and unduly burdensome procedures to avail themselves of such alternatives.

286.   The Driver Responsibility Program operates to the specific disadvantage of impoverished drivers, creating massive inequality across the state on the basis of wealth status and access to resources.  *See* Jamie Lovegrove, "Lawmakers Compare Unpopular Driver

Surcharge Program to Debtor's Prison," *The Texas Tribune* (Jan. 27, 2016)[7] (quoting Texas Senator Sylvia Garcia stating the program "just makes poor people poor," and Judge Jean Spradling Hughes of Harris County Criminal Court stating "I don't know if I've seen a public law with such dire unintended consequences").

### ii.   Defendants' Punitive Scheme Discriminates Against Individuals Because They Owe Debt to the State

287.   A state may not impose unduly harsh or discriminatory debt collection practices upon individuals merely because their debts are owed to the government rather than a private creditor.

288.   Lower-income individuals with outstanding DRP surcharges are threatened with, and subjected to, the debilitating consequence of license suspension because they owe impossible amounts of debt to the state.

289.   State-sanctioned license suspension affects an individual's job prospects, health, family life, and daily freedom — a uniquely harsh debt collection measure used against those who owe their debts to the state.   By contrast, such punishment is not available to private creditors to inflict on their debtors.

290.   Texas' harsher, state-sanctioned treatment against impoverished debtors simply because they are indebted to the government — as opposed to a private creditor — violates equal protection.

### iii.   License Suspensions for Failure to Pay Surcharges Are Not Rationally Related to Any Legitimate Government Interest

291.   The DRP is designed to coerce payment and increase "responsibility," yet its complex and harsh scheme accomplishes neither.   No amount of punishment or additional fines will result in payment from an individual who is simply too impoverished to pay.   By suspending

---

[7] https://www.texastribune.org/2016/01/27/state-senators-criticize-driver-responsibility-pro/

the licenses of individuals who cannot afford their surcharges, Defendants cripple their ability to enter or stay in the workforce, impeding responsible behavior and nearly ensuring that surcharges will remain unpaid.

292.    Indeed, more than 60% of fees under the surcharge program went uncollected between 2003 and 2013.  Texas Criminal Justice Coalition, Fact Sheet (2015).[8]

293.    For individuals with infractions that usually correlate with indigence — driving with no license and driving with an invalid or expired license — DRP surcharge collection rates are an abysmal 29% and 23% respectively.  Tex. Legis. Budget Board, Driver Responsibility Program (Jan. 2016).[9]

294.    For individuals living in poverty, avoiding a license suspension simply does not operate as an incentive to pay when they must choose between paying surcharges and paying rent, paying for healthcare, feeding their families, and paying for other necessary expenses.

295.    The DRP surcharge program is not only irrational, but indeed counterproductive. Since its inception, Texas has seen an increase of 1.3 million unlicensed drivers, many of whom are on the road, and a nearly 5% *increase* in alcohol-related fatalities on Texas roads.  Sen. Don Huffines, "End This Debtor's Prison for Texas Drivers," Texas Star-Telegram (Aug. 1, 2016).[10]

296.    The Driver Responsibility Program irrationally compounds the problems it purports to address.  For example, instead of issuing a "fix it" citation to individuals without insurance, the DRP follows an irrational course of action: it imposes even more debt on these

[8]https://www.texascjc.org/system/files/publications/TCJC%20Fact%20Sheet%20SB%2093%20 %28Driver%20Responsibility%20Program%29.pdf
[9]https://policy.tti.tamu.edu/wp-content/uploads/2016/01/3184_Jan_2016_Senate_Transportation.pdf
[10] https://www.star-telegram.com/opinion/opn-columns-blogs/other-voices/article93142182.html

already-struggling drivers, making it less likely that these individuals will be able to purchase insurance and come into compliance with traffic laws.

297.    Texas' system of generating additional surcharges from those with multiple traffic infractions disproportionately affects Texas' most over-policed drivers, disrupting family life and making employment, healthcare, and education substantially more difficult to access for a particular subset of vulnerable people.

298.    License suspensions against impoverished individuals contravenes legitimate government interests — lack of a license hinders struggling individuals from finding and maintaining lawful work, making payment of debts even more unlikely and driving lower-income Texans into a cycle of poverty.

299.    The debilitating nature of the DRP contravenes its stated purposes.  Hindering an individual's ability to access recovery resources, uphold familial responsibilities, and maintain gainful employment will only *decrease* their ability to behave "responsibly" and pay off their mounting debts into the state's fund.

> iv.    **License Suspensions Result in an Inescapable Cycle of Poverty and Involvement in the Criminal System**

300.    License suspension drastically lowers the chance of a person successfully paying off their court-imposed debts; indeed, it undercuts the state's interest in collecting outstanding debt.

301.    Research has consistently found that having a driver's license can be necessary to maintain a job, pursue educational opportunities, and care for children and dependent relatives. *See* "Letter to Colleague" from Vanita Gupta & Lisa Foster, U.S. Department of Justice (Mar. 14, 2016).[11]

---

[11] https://www.justice.gov/crt/file/832461/download

302.    License suspension exacerbates poverty, trapping low-income people in an inescapable cycle: not only is loss of a license a direct barrier to finding employment, but many employers require the possession of a valid driver's license before hiring in the first place.  Alana Semuels, "No Driver's License, No Job," *The Atlantic* (June 15, 2016).[12]  A valid driver's license is also essential to maintaining employment if it can be secured.  *Id.*

303.    Indeed, a rigorous study of New Jersey drivers found 42% of drivers lost their jobs after their driving abilities were suspended.   Jon A. Carnegie, Ian M. Voorhees Transportation Center, Rutgers, The State University of New Jersey, *Driver's License Suspensions, Impacts and Fairness Study* 56 (2007).[13]

304.    Of those drivers, 45% were unable to find new employment.  *Id.*

305.    Of those who were able to find another job, 88% reported a decrease in income.  *Id.*

306.    Suspended licenses can trap people who are poor in an impossible situation.  They cannot afford to reinstate their licenses without steady employment, but are unable to work without a license.

307.    Paying off debt is particularly difficult for the 4.4 million people living below the federal poverty line in Texas.

308.    Ranking 39th out of the 50 states, Texas has one of the highest levels of poverty in the country, with 15.6% of the population living in poverty.[14]

309.    Because of the hardship of living without reliable transportation, it is estimated that 75% of those with suspended licenses continue to drive out of necessity.   *American*

---

[12] https://www.theatlantic.com/business/archive/2016/06/no-drivers-license-no-job/486653
[13] http://www.nj.gov/transportation/refdata/research/reports/FHWA-NJ-2007-020-V1.pdf
[14] "Texas 2017," *Talk Poverty*, https://talkpoverty.org/state-year-report/texas-2017-report/.

*Association of Motor Vehicle Administrators,* Suspended and Revoked Drivers Working Group, Best Practices 2013, p. 4.[15]

310.    In Texas, where cities are spread over large expanses and public transportation is unreliable or often unavailable, individuals are more likely to drive on a suspended license out of necessity.  *See* Ex. 1, Decl. of Leslie Ginzel at ¶ 9 ("The Texas DRP drives low-income drivers even further into poverty, and prevents them from maintaining a valid Texas driver's license, but their need to drive doesn't just go away.. . .  Driving [in Texas] is a necessity, not a privilege.").

311.    In Texas, individuals who drive with suspended or expired licenses subject themselves to the possibility of being found guilty of a Class C misdemeanor for their first offense, and a Class B misdemeanor for any subsequent offense.  Tex. Transp. Code Ann. § 521.457.

312.    A misdemeanor conviction can carry additional court-imposed fines and thus perpetuates a cycle of debt and contact with the criminal justice system for those too poor to pay their fines and surcharges in the first place.  *See* Ex. 8, Decl. of Judge Zaragoza at ¶ 5 ("When the DRP program forces [people] to pay $250 in surcharges for 3 years, they really can't afford the insurance and the surcharge fees. For most, however, transportation is a necessity. People need transportation to get to work and to take children to school and to medical appointments. So, they keep driving, and receiving more citations and surcharges, until the payments are beyond their ability to ever pay, and they are never able to obtain a valid license.").

313.    In Fiscal Year 2014 alone, nearly 300,000 Class B misdemeanor cases for "Driving with an Invalid License" were added to Texas's court dockets, meaning the DRP is likely clogging local court systems and causing lower-income individuals to accrue criminal

---

[15] http://www.aamva.org/Suspended-and-Revoked-Drivers-Working-Group/

records for simply trying to carry out necessary daily activities to support themselves and their families. *See* Texas Criminal Justice Coalition, Fact Sheet (2015).[16]

314.     Trapping people unable to pay surcharges in a cycle of economic hardship and continued traffic infractions is irrational; it serves no legitimate government interest and instead hinders individuals attempting to pay their debts, work steady jobs, and care for their families.

### F.     Texas' Wealth-Based License Suspension Scheme Violates the Fundamental Right to Travel

315.     Plaintiffs have the right to freely travel within their states — a right that, like the right to interstate travel, is fundamental and cannot be abridged without passing heightened judicial scrutiny.  *See, e.g.*, *United States v. Wheeler*, 254 U.S. 281, 293 (1920) (citizens "possess the fundamental right . . . [to] peacefully dwell within their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom").

316.     In a sprawling state like Texas, travel via automobile is essential to self-sufficiency, employment, family care, and other essential daily activities.

317.     Plaintiffs are impoverished and cannot afford to pay for taxis or other car services for their daily needs; they live in areas where public transportation is woefully inadequate for their needs, and at times public transportation can even be dangerous to their health.  Texas' weather conditions and urban sprawl make other forms of transportation, such as walking or biking, infeasible alternatives to driving a car.

318.     Thus, Plaintiffs' only reliable and safe form of transportation is to drive a personal vehicle.

319.     Defendants have suspended Plaintiffs' driver's licenses simply because they are too poor to afford the full amount of their DRP surcharges.

---

[16]https://www.texascjc.org/system/files/publications/TCJC%20Fact%20Sheet%20SB%2093%20 %28Driver%20Responsibility%20Program%29.pdf

320.     Even if some Plaintiffs, like Mr. Salahuddin and Ms. Rodriguez, might find a way to make their small monthly installment payments, the DRP surcharge suspension still operates as a total ban on all driving in all places at all times until Plaintiffs pay off their hundreds of dollars *entirely*.

321.     Plaintiffs like Mr. Stevens and Mr. Alexander have been given — or expect to be given — reductions in their surcharges, but the reduced surcharge amounts are imposed automatically without any individualized inquiry into their financial circumstances or ability to pay.  Mr. Stevens and Mr. Alexander have no hope of paying thousands of dollars in reduced surcharges.  Thus, Plaintiffs' suspensions continue to operate as a total ban on all driving in all places at all times solely due to their poverty.

322.     Defendants' surcharge suspension scheme deprives Plaintiffs of the fundamental right to travel without being narrowly tailored to a government interest.  Stripping Plaintiffs of their ability to find, maintain, and access employment does not serve the state's interest in coercing payment or increasing personal responsibility.   Indeed, license suspension is counterproductive to these interests.

### Class Action Allegations

323.     The named Plaintiffs bring this action on behalf of themselves and all others similarly situated to assert the claims alleged in this Complaint on a common basis.

324.     A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class Members can challenge Defendant's unlawful wealth-based license suspension scheme.

325.     This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(l)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

326.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

327.   Plaintiffs propose one Class seeking declaratory and injunctive relief. The Declaratory and Injunctive Class is defined as: **all individuals who currently have, or will have, their driver's license or driving eligibility suspended for nonpayment of surcharges under Texas's Driver Responsibility Program, Tex. Transp. Code Ann. § 708, *et seq.*, who could not at the time of suspension afford to pay such debt.**

A.   **Numerosity — Fed. R. Civ. P. 23(a)(1)**

328.   As of January 2018, "the number of licenses, id's and unlicensed numbers suspended due to [the] DRP" surcharge program was 1,461,786.  Ex. 3, Public Information Request Response Letter from DPS at ¶ 4 (Jan. 23, 2018).

329.   Tens of thousands of Texas drivers are subject to license suspension each year for failure to pay Driver Responsibility Program surcharge fees.

B.   **Commonality — Fed. R. Civ. P. 23(a)(2)**

330.   The relief sought is common to all Class Members, and common questions of law and fact exist as to all Class Members.  The named Plaintiffs seek relief concerning whether the automatic suspension scheme violates the rights of the Class Members and relief mandating that Defendants end the scheme so that the constitutional rights of the Class Members will be protected in the future.

331.   These common legal and factual questions arise from one scheme: Defendants' automatic suspensions based on inability to pay DRP surcharges.  The material requirements of the suspension statutes do not vary from Class Member to Class Member, and the resolution of

these legal and factual issues will determine whether all Class Members are entitled to the relief

they seek.

332.    Among the most important, but not the only, common questions of fact are:

- Whether Texas has a policy and practice of failing to provide pre-deprivation ability-to-pay inquiries;
- Whether the Department of Safety's notice to individuals with surcharges assessed against them is inadequate and fails to meaningfully provide notice to protect Class Members from an unlawful property and liberty deprivation;
- Whether the Driver Responsibility Program treats impoverished drivers more harshly than wealthy drivers;
- Whether suspending impoverished individuals' driver's licenses for failure to pay court debt decreases — rather than increases — the likelihood that they will be able to pay their surcharge debt to the state;
- Whether, with no viable public transportation options, the loss of a driver's license amounts to a loss of ability to travel within the state;
- Whether individuals have received ability-to-pay hearings and have been found able to pay before they are subjected to payment plans that will form the basis for nonpayment suspensions;
- Whether Defendants have a policy and practice of suspending driver's licenses without offering adequate information or routes to alternative options for those who cannot pay;
- Whether Defendants have a policy and practice of suspending driver's licenses without conducting meaningful inquiries into the ability of a person to pay before taking punitive action.

333.    Among the most important, but not the only, common questions of law are:

- Whether the process afforded to individuals with DRP surcharges is patently inadequate, fails to give meaningful notice of payment alternatives, and is not reasonably calculated to inform individuals of the procedures required to obtain payment alternatives prior to deprivation of a license;
- Whether automatic determination of payment plan rates or payment reductions, without notice or opportunity to be heard on the issue of financial circumstance or ability-to-pay, constitutes meaningful process before an individual is deprived of their property interest in their license;
- Whether it is fundamentally unfair to convert a fine into a more serious deprivation — indefinite license suspension — when an individual is unable rather than unwilling to pay the fine;
- Whether the complete deprivation of driver's licenses for the impoverished class of people unable to pay their fines and fees amounts to wealth-based discrimination;
- Whether suspension of driver's licenses for those who are unable to pay their debt is rationally related to a legitimate state interest;

- Whether, in a state like Texas where certain areas have no viable public transportation options, the loss of a driver's license amounts to an infringement of the fundamental right to travel;
- Whether suspension of driver's licenses for those who are unable to pay their debt is narrowly tailored to a state interest;
- Whether a person is entitled to notice and an opportunity to pursue alternative options other than payment in full or payment in installation amounts automatically assigned by the government before losing her property interest in her driver's license; and
- Whether a person is entitled to a meaningful inquiry into her present ability to pay before Defendants suspend her license for nonpayment.

### C.      Typicality — Fed. R. Civ. P. 23(a)(3)

334.    The named Plaintiffs' claims are typical of the other Class Members' claims, and they have the same interests in this case as all other Class Members.  Each Class Member has had or will have their driver's license suspended due to an inability to pay court debts.  The answer to whether Defendants' wealth-based suspension scheme is unconstitutional will determine the claims of the named Plaintiffs and every other Class Member.

335.    If the named Plaintiffs succeed in the claim that Defendants' policies and practices concerning wealth-based suspension violate their constitutional rights, that ruling will likewise benefit every other Class Member.

### D.      Adequacy — Fed. R. Civ. P. 23(a)(4)

336.    The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims.  They are members of the Class, and their interests coincide with, and are not antagonistic to, those of the other Class Members.

337.     There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights in the face of Defendants' wealth-based suspension scheme.

338.     The Class is represented by attorneys from Equal Justice Under Law and the Austin Community Law Center, who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law.

339.     The efforts of Class counsel have so far included extensive investigation into Defendants' suspension scheme, including numerous interviews with witnesses, attorneys, and advocates throughout the region, statewide experts in the functioning of state and local courts, and national experts in constitutional law, law enforcement, judicial procedures, and criminal law.

340.     Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

341.     As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the Defendants' scheme and with the relevant state and federal laws. The interests of the Class Members will be fairly and adequately protected by the named Plaintiffs and their attorneys.

**E.     Rule 23(b)(2)**

342.     Class action status is appropriate because Defendants have acted or will act in the same unconstitutional manner with respect to all Class Members.  Defendant enforces a wealth-based suspension scheme: wealthy Texas residents who are ordered to pay costs, fees, fines, and

assessments by the courts are able to retain their driving privileges, while the poorest residents are further forced into a cycle of poverty.

343.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from enforcing the automatic suspensions, reinstatement fees, and Driver Responsibility Program surcharges against lower-income individuals.  Because the putative Class challenges Defendant's scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

344.    Injunctive relief compelling Defendants to comply with these constitutional rights will similarly protect each Class Member from being subjected to Defendants' unlawful policies and practices.  A declaration and injunction stating that Defendants cannot suspend driver's licenses as a punishment for being poor would provide relief to every Class Member.  Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## Claims for Relief

### Count One: Violation of Procedural Due Process
### Amendments V and XIV
### (Facial Challenge)

345.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

346.    A person's driver's license is recognized as a property interest that may not be taken away without due process of law.  *See Bell v. Burson*, 402 U.S. 535 (1971).  Plaintiffs have protected property and liberty interests in their driver's licenses and their ability to drive legally.

347.    Legislatures must establish standards of enforcement of the law that are precise enough to satisfy due process.  *Cline v. Frink Dairy Co.*, 274 U.S. 445, 465 (1927).  Plaintiffs have a right to be free from arbitrary enforcement of laws that are unconstitutionally vague, resulting in enforcement that is imprecise or that involve so many factors that the outcome under

the law is unclear or unenforceable.  *See id; see also Kolender v. Lawson*, 461 U.S. 362, 357 (1983).

348.    The DRP statutory scheme is unconstitutionally vague.  It fails to give notice to the public about how to apply for wealth-based relief under the DRP; it fails to give notice to the Department of Public Safety regarding proper enforcement of wealth-based relief under the DRP; and it fails to define key terms to facilitate meaningful procedural protections for impoverished persons in danger of losing their driver's license.

349.    The vague and procedurally faulty DRP statutory scheme enforced by Defendants violates the due process rights of Plaintiffs.

### Count Two: Violation of Procedural Due Process
### Amendments V and XIV
### (As-Applied Challenge)

350.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

351.    Plaintiffs have protected property and liberty interests in their driver's licenses and their ability to drive legally.

352.    Plaintiffs have an interest in their surcharges being waived pursuant to procedural protections in Texas's law due to their indigence.

353.    Defendants violate Plaintiffs' procedural due process rights by suspending licenses for nonpayment of fees against impoverished individuals without providing meaningful processes calculated to avoid discriminatory or erroneous deprivation.

354.    Defendants violate Plaintiffs' procedural due process rights by failing to conduct individualized assessments into lower-income individuals' financial status and ability to pay

before automatically setting monthly installment rates, the nonpayment of which results in automatic license suspension.

355.    Defendants violate Plaintiffs' procedural due process rights by failing to give adequate notice about the DRP's wealth-based alternatives and how to apply for them prior to automatically suspending licenses for nonpayment.

356.    Defendants violate Plaintiffs' procedural due process rights by operating surcharge reduction programs through automatic reduction amounts without notice or opportunity to be heard on the matter of ability to pay those reduced amounts.

357.    Defendants violate Plaintiffs' procedural due process rights by keeping them in an indefinite state of license suspension until they have paid off their surcharges in their entirety, even after they have entered into an installment plan.

358.    The Fourteenth Amendment's Due Process Clause requires that Defendants provide meaningful notice and opportunity to be heard prior to a deprivation, and that they maintain a standard of fundamental fairness in its justice system.

359.    Defendants' automatic imposition of surcharges, lack of notice and obfuscation of alternative programs for lower-income individuals (and how to access them), and automatic license suspensions for nonpayment of surcharges violate the principle of due process.

### Count Three: Violation of Equal Protection Under *Bearden v. Georgia* Amendment XIV (Facial Challenge)

360.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

361.    Defendants enforce a vague scheme with inadequate or nonexistent guidelines to protect impoverished individuals from losing their licenses simply because they are too poor to pay.

362.    Defendants' scheme operates to disadvantage impoverished drivers and create massive inequality on the basis of access to resources and money.

363.    Defendants' license suspension scheme does not provide for any surcharge exceptions or exemptions from punishment for individuals whose nonpayment of surcharges is involuntary.

364.    Defendants' license suspension scheme does not provide adequate protections to ensure that lower-income individuals are not treated more harshly than wealthier individuals.

365.    Defendants' license suspension scheme does not provide adequate protections to ensure that lower-income individuals are not subjected to punitive sanctions simply due to their poverty.

366.    No amount of coercion or punishment can make an impoverished person pay surcharges if she is simply unable to pay them.  By suspending the licenses of lower-income drivers for nonpayment of surcharge fees, Defendants' scheme discriminates on the basis of wealth status.

**Count Four: Violation of Equal Protection and Fundamental Fairness Under *Bearden v. Georgia***
**Amendment XIV**
**(As-Applied Challenge)**

367.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

368.    The Due Process and Equal Protection clauses together guarantee Plaintiffs a right to fundamental fairness in government processes used against them, particularly in the context of protection against poverty-based punitive actions.

369.    Defendants suspend licenses under the DRP solely as a penalty for failure to pay a monetary amount.   DRP suspensions do not occur for public safety reasons, traffic safety reasons, or any reason other than inability to pay surcharges.

370.    Because Defendants take punitive action for nonpayment without any inquiry into whether that nonpayment was willful, they violate the Fourteenth Amendment's guarantee of fundamental fairness and the Supreme Court's proscription against government-enforced penalties or disadvantages that result from one's poverty.

**Count Five: Violation of Equal Protection**
**Amendment XIV**
**(As-Applied Challenge)**

371.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

372.    Defendants' suspension scheme discriminates on the basis of wealth-status because it results in lower-income individuals suffering a complete deprivation of their licenses due to inability to pay — which can take years to overcome — while wealthier drivers who can pay immediately never risk a day of license suspension.

373.    The procedural inadequacies of Defendants' license suspension scheme necessarily operate to discriminate against impoverished drivers who are without access to information, resources, or immediately available sums of money.

374.    Defendants fail to reinstate licenses for individuals on payment plans even while they are making on-time payments.   Thus wealthy individuals pay their surcharges immediately

and continue to drive, while poorer individuals suffer a virtually indefinite license suspension while they struggle to pay what they can.

375.    Suspending the licenses of already-struggling Texans simply because they cannot afford to pay is counterproductive and contravenes state interests in collecting fees and facilitating responsibility.

376.    The government has no legitimate interest in punishing people for being poor — Defendants violate the equal protection rights of Plaintiffs and those similarly situated by suspending their licenses simply because they are poor, without a rational connection to any legitimate government interest.

**Count Six: Extraordinary Collection**
**Amendment XIV and *James v. Strange***

377.    Plaintiffs incorporate by reference each and all of the previous allegations in this Complaint.

378.    Defendants' suspension scheme discriminates on the basis of an individual's form of debt because it imposes unduly harsh collection practices — state-sanctioned license suspensions — upon impoverished individuals merely because their debts are owed to the government rather than a private creditor.  *See James v. Strange*, 407 U.S. 128 (1972).

379.    Defendants' counterproductive collection method of suspending people's licenses when they are unable to pay surcharges is not rationally related to any legitimate state interest, and indeed contravenes state interests in public welfare, maintaining a productive workforce, collecting debt, and promoting responsibility.

380.    Defendants' discriminatory enforcement of the DRP thus violates equal protection and the prohibition against extraordinary collection by the government.

### Count Seven: Violation of the Fundamental Right to Travel
### Amendment XIV

381.    Plaintiffs incorporate by reference each and all of the previous allegations in this complaint.

382.    Plaintiffs have a deeply-rooted liberty interest in freely traveling between states and throughout their states and localities. Because Plaintiffs have no viable alternatives to driving, Defendants' blanket suspension of their licenses infringes their fundamental right to travel without being narrowly tailored to a government interest.

### **Jury Request**

383.    Plaintiffs respectfully demand a jury trial pursuant to Fed. R. Civ. P. 38(a) and (b).

### **Requested Relief**

WHEREFORE, Plaintiffs request that the Court issue the following relief:

a.    A declaratory judgment that Defendants' policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiffs' and Class Members' rights under the Constitution and laws of the United States;

b.    An order and judgment preliminarily and permanently enjoining Defendants, their subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with the Department of Public Safety or on its behalf from issuing or processing orders of driver's license suspensions for unpaid surcharges under the Driver Responsibility Program against Plaintiffs and Class Members until such time as the State of Texas implements a system that complies with the United States Constitution;

c.    An order and judgment preliminarily and permanently ordering Defendants to reinstate Plaintiffs' and Class Members' licenses that have been suspended for failure to pay Driver Responsibility Program surcharges and enjoining Defendants from requiring Plaintiffs and Class Members to pay the reinstatement fee or other fees as a condition of reinstatement for such suspensions; and

d.    An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems proper.

Respectfully submitted,


/s/ Phil Telfeyan
Phil Telfeyan
District of Columbia Bar No. 1029157 (*pro hac vice* forthcoming)
Marissa K. Hatton
District of Columbia Bar No. 219291 (*pro hac vice* forthcoming)

Equal Justice Under Law
400 7th Street NW, Suite 602
Washington, D.C. 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
mhatton@equaljusticeunderlaw.org


Brian McGiverin
Texas Bar No. 24067760

Austin Community Law Center
2221 Hancock Drive
Austin, TX 78756
Telephone: (512) 596-0226
Fax: (512) 597-0805
brian@austincommunitylawcenter.org


*Attorneys for Plaintiffs and those similarly situated*